SM

**FILED**

OCT 2 7 2021

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| **ROBERT H. ALAND,** ) | 1:21-cv-05749 |
| ) | Judge Martha M. Pacold |
| Plaintiff, ) | Magistrate Judge Heather K. McShain |
| ) | RANDOM |
| **v.** ) | |
| ) | |
| **U. S. DEPARTMENT OF THE INTERIOR;** ) | |
| **DEB HAALAND,** Secretary of the U. S. ) | |
| Department of the Interior; **U. S. FISH &** ) | |
| **WILDLIFE SERVICE;** and **MARTHA** ) | Endangered Species Act,16 U.S.C. |
| **WILLIAMS,** Principal Deputy Director of ) | §§ 1531 et seq.; Administrative |
| the U. S. Fish & Wildlife Service, ) | Procedure Act, 5 U.S.C. §§ 551 et |
| ) | seq. |
| Defendants. ) | |
| ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### I. Introduction

1. This is a civil suit for declaratory, vacatur and injunctive relief under the citizen suit

provision of the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. § 1540(g)(1)(A), and the

Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A) and (D).  This action seeks to

declare invalid, vacate and set aside and enjoin implementation of, the final agency action by the

U. S. Fish & Wildlife Service ("FWS"), an agency of the U. S. Department of the Interior

("DOI"), published in the Federal Register on November 3, 2020 (85 Fed. Reg. 69778; "2020

Final Delisting Rule"), illegally removing gray wolves (*Canis lupus*) in the lower 48 United

States and Mexico ("Gray Wolves") from the list of threatened and endangered species set forth

in 50 C.F.R. § 17.11(h) and their critical habitat set forth in 50 C.F.R. § 17.95(a), effective

January 4, 2021.

## II. **Parties**

2. **Plaintiff.** (a) Plaintiff, a retired lawyer and Adjunct Professor at the Northwestern University School of Law, resides in Winnetka, Cook County, Illinois 60093, United States of America. For the last 20 years or more Plaintiff has been directly, indirectly (through numerous environmental organizations) and substantially involved in actions to protect and preserve wildlife and their habitats.

(b)(i) Plaintiff has been a regular visitor to, and has spent substantial time in, the Greater Yellowstone Ecosystem ("GYE"), primarily northwest Wyoming, for more than 40 years. He first visited the GYE, a vast, mountainous and relatively unpopulated area consisting of almost 20 million acres in northeast Idaho, southwest Montana and northwest Wyoming that includes some of America's most cherished wild lands, in 1974. In the period from 1998 to the date of filing this Complaint, Plaintiff has visited the GYE an average of 5 - 6 times annually.

(ii) During his visits to the GYE, Plaintiff has regularly and frequently hiked and engaged in other outdoor activities, including wildlife viewing, wildlife and scenic photography, boating, skiing, snow-shoeing and aesthetic enjoyment, in areas inhabited by Gray Wolves, including areas within Grand Teton National Park, where he has seen Gray Wolves, and Yellowstone National Park.

(iii) Plaintiff has participated (1) financially in successful group efforts to purchase and retire allotments for grazing domestic livestock held by private individuals on public lands in the GYE to prevent wildlife conflicts with domestic grazing operations and (2) physically in group efforts to remove barbed wire fences on retired allotments so that wildlife can have unrestricted access to those public lands free of conflicts and traverse those public lands free of danger from barbed wire fences particularly when hidden by deep snow.

(c)  Plaintiff submitted detailed written comments to Defendants in opposition to

Defendants' (i) 2005 proposed rule to remove ESA protection for GYE grizzly bears (70 Fed.

Reg. 69854 (Nov. 17, 2005)) on February 20, 2006, and written supplements to those comments

on March 4, June 12, October 4 and November 7, 2006, and February 12, 2007, and (ii) 2016

proposed rule to remove ESA protection for GYE grizzly bears (81 Fed. Reg. 13174 (March 11,

2016)) on May 9, 2016, and written supplements to those comments on May 14 and 17 and

October 6, 2016.

(d)  Plaintiff also submitted detailed written comments to Defendants and the U. S.

Department of Agriculture ("USDA") in support of protection and preservation of wildlife and

critical habitat, including  (i) Defendants' 2018 proposed amendment to 50 C.F.R. § 424.11

eliminating language from the regulations that precluded Defendants from taking economic and

other impacts into account in listing, delisting and reclassifying decision under the ESA (83 Fed.

Reg. 35193 (July 25, 2018)), and a written supplement to those comments on October 5, 2018;

(ii) Defendants' 2015 Yellowstone Bison Management Plan and Environmental Impact

Statement promulgated by the National Park Service, an agency of Defendant DOI, on June 15,

2015, in cooperation with the State of Montana; (iii) USDA's 2016 Environmental Assessment:

Predator Damage and Conflict Management in Wyoming promulgated by Animal and Plant

Health Inspection Services (Ref: APHIS-2016-0084-0001); (iv) environmental organizations'

April 19, 2017, Petition to List Giraffe (*Giraffa camelopardalis*) under the ESA on May 8, 2019

(see 84 Fed. Reg. 17768 (April 6, 2019)); and (v) USDA's (1) November 2020 East Paradise

Range Allotment Management Plan, Environmental Assessment, requesting the termination of

grazing allotments in Montana to protect public lands and wildlife and two supplements to those

comments and (2) 2021 Decision Notice with regard to those allotments.

(e) (i)  Plaintiff was plaintiff *pro se* and *pro bono* in a civil suit under 16 U.S.C. § 1540(g)(1)(A) to invalidate Defendants' 2007 final rule removing ESA protection for GYE grizzly bears (*Aland v. Salazar*, U. S. District Court, Northern District of Illinois, Eastern Division, Case No. 1:07-cv-04358-JBZ; filed August 2, 2007), and was an amicus curiae in the civil suit that invalidated that final rule (*Greater Yellowstone Coalition, Inc. v. Servheen*, 672 F. Supp. 2d 1105 (D. Mont. 2009), aff'd, 665 F. 3d 1015 (9th Cir. 2011)). [1]

(ii)  Plaintiff was a plaintiff *pro se* and *pro bono* in a consolidated civil suit under 16 U.S.C. § 1540(g)(1)(A) that invalidated Defendants' 2017 final rule removing ESA protection for GYE grizzly bears.  *Crow Indian Tribe v. United States*, 343 F.Supp.3d 999 (D. Mont. 2018), aff'd, 965 F.3d 662 (9th Cir. 2020).

(iii)  Plaintiff devoted thousands of hours and expended significant funds over more than 15 years to the prosecution of these civil suits.

(f)  Plaintiff intends to continue activities to protect and preserve wildlife and habitat indefinitely into the future against unlawful actions by Defendants and other federal agencies.

(g)  Plaintiff expects in the future to travel to northern Wisconsin, where, as a youngster, he attended summer camps (from his home in Alabama) for eight years; and he expects to engage in hiking and other activities and see Gray Wolves in that area.  Plaintiff also expects in the future to travel to other states covered by the 2020 Final Delisting Rule where Gray Wolves occur at the present and to engage in such activities and see Gray Wolves.

---

[1] Plaintiff's suit was transferred to the U. S. District Court in Boise, Idaho, where a comparable civil suit was pending, and assigned Case No. 1:08-cv-00024-EJL.  Thereafter the Idaho District Court stayed both cases while *Greater Yellowstone* was pending on appeal by Defendants in the Ninth Circuit and dismissed the cases after the Ninth Circuit's affirmance on the ground that they were moot.

(h)  Plaintiff anticipates that in due course Gray Wolves will occur naturally in or be translocated to Illinois, one of the states included in the "44-State entity" described in the 2020 Final Delisting Rule, where he has resided since 1966 and expects to continue to reside in the future, and he expects to enjoy Gray Wolves in Illinois unless Defendants are allowed to thwart occurrence of new populations of Gray Wolves in Illinois and other states in the "44-State entity" if the 2020 Final Delisting Rule is not invalidated and set aside.

(i)  Plaintiff's enjoyment of areas in which Gray Wolves occur has been and will continue to be immeasurably enhanced by the presence of Gray Wolves, which are icons of American history and culture, enhance the wildness and natural state of these areas and are essential to the health of the overall ecosystems in which they occur.

(j)  Plaintiff, as a result of promulgation of the 2020 Final Delisting Rule in violation of the ESA and the APA, has suffered, and will continue to suffer on an ongoing basis in the future, injury in fact, which is concrete and particularized and actual and imminent rather than conjectural or hypothetical due to (i) the killing and maiming of Gray Wolves unleashed by the 2020 Final Delisting Rule and the resulting ecological harm to the ecosystems where Gray Wolves now occur and will occur in the future; (ii) the adverse impact on his recreational pursuits such as hiking, boating, cross-country skiing, wildlife viewing and photography and aesthetic enjoyment; and (iii) the loss, in the words of the philanthropist and environmentalist, Laurance S. Rockefeller, whose name adorns the Visitor Center in Grand Teton National Park, of the "spiritual renewal that comes along with the wonder of the natural world." These injuries are directly traceable to Defendants as a result of the issuance of the 2020 Final Delisting Rule in violation of the ESA and APA; and it is likely, and not merely speculative, that the injuries will

be redressed by a decision favorable to Plaintiff in this litigation resulting in the reinstatement of ESA protection and preservation of Gray Wolves.

3. **Defendants.** (a) Defendant DOI, and its agency, Defendant FWS, are federal agencies that are entrusted with responsibility for listing and delisting species, including Gray Wolves, under the ESA and are the agencies that promulgated the 2020 Final Delisting Rule. See 50 C.F.R. § 402.01(a), (b).  According to its website mission statement, Defendant DOI "protects and manages the Nation's natural resources and cultural heritage [and] provides scientific and other information about those resources . . . ."  According to its website mission statement, Defendant FWS's mission is to "work with others to conserve, protect and enhance fish, wildlife and plants and their habitats for the continuing benefit of the American people."

(b) Defendant Haaland is the Secretary of Defendant DOI.  In that capacity Defendant Haaland has management and supervisory responsibility over Defendants.  Defendant Haaland is sued in her official capacity.

(c) Defendant Williams is the Principal Deputy Director of Defendant FWS and currently has direct management and supervisory responsibility over Defendant FWS. Defendant Williams is sued in her official capacity.

### III.  Jurisdiction & Venue

4.  Plaintiff brings this civil action pursuant to the ESA, 16 U.S.C. §§ 1531 – 1544, and the APA, 5 U.S.C. §§ 551 – 706.  This Court has subject matter jurisdiction over Plaintiff's claims pursuant to the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(1)(A), and 28 U.S.C. § 1331 (federal question).

5.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Plaintiff resides in the Northern District of Illinois, Eastern Division.

6.  This Court can issue a declaratory judgment and grant further relief, including vacatur and injunctive relief, pursuant to 16 U.S.C. § 1540(g)(1)(A), 28 U.S.C. §§ 2201(a) and 2202 and 5 U.S.C. § 706.

## IV.  Notice & Administrative Remedies

7.  Pursuant to and in compliance with 16 U.S.C. § 1540(g)(2), on November 30, 2020, Plaintiff gave the required Notice ("60-Day Notice") to Defendants of his intent to file this civil suit under 16 U.S.C. § 1540(g)(1)(A) to declare invalid, vacate and set aside and enjoin the 2020 Final Delisting Rule.  By letter dated January 28, 2021, Gary Frazer, Defendant FWS's Assistant Director of Ecological Services, who was Defendants' high-level official assigned overall responsibility for the Gray Wolves delisting project, acknowledged Defendants' receipt of the 60-Day Notice.

8.  More than sixty (60) days have passed since Plaintiff gave the 60-Day Notice to Defendants.

9.  The 2020 Final Delisting Rule constitutes final agency action by Defendants subject to judicial review within the meaning of 5 U.S.C. § 704.

10.  The issue of whether Defendants exceeded their rule-making authority in promulgating the 2020 Final Delisting Rule can be decided based upon the Administrative Record ("AR"), supplemented, if necessary, by Order of this Court or agreement of the parties. See ¶ 58, including footnote 13.

11.  Plaintiff has exhausted all available administrative remedies under the ESA and otherwise and has satisfied all statutory preconditions to file this civil suit.

## V. The ESA

12.  Congress enacted the ESA to conserve species that are of "esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people" but have been "so depleted in numbers that they are in danger of or threatened with extinction." 16 U.S.C. § 1531(a)(2), (3).

13.  The U. S. Supreme Court in a landmark case, *Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978), relying on legislative history, stated that the ESA "as it was finally passed, . . . represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Id.* at 180.  The Court stated that "one would be hard pressed to find a statutory provision whose terms were any plainer than those in [16 U.S.C. § 1536(a)(2)]." "Its very words affirmatively command all federal agencies 'to *insure* that actions *authorized, funded, or carried out* by them do not *jeopardize* the continued existence' of an endangered species or '*result* in the destruction or modification of habitat of such species . . . .'" *Id.* at 173 (citation omitted; emphasis in original).  As a result, the Court stated, "examination of the language, history, and structure of the [ESA] indicates beyond doubt that Congress intended endangered species to be afforded the ***highest of priorities***." *Id.* at 174 (emphasis added).

14.  (a)  A species must be "listed" as an endangered or threatened species to receive the protection of the ESA.  An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).  A "threatened species" is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(20).

(b)  The phrase "significant portion of its range" in 16 U.S.C. §§ 1532(6) and (20) is important with regard to the protection of endangered or threatened species under the ESA, since

the phrase, depending on its interpretation, either restricts or expands the geographic area in which the species will be protected and the size of the protected population.  Defendants and the National Marine Fisheries Service ("NMFS"), another agency of Defendants that has responsibility for administering the ESA, have promulgated a highly restrictive policy interpretation.  *Final Policy on Interpretation of the Phrase "Significant Portion of Its Range" in the Endangered Species Act's Definitions of "Endangered Species" and "Threatened Species,"* 79 Fed. Reg. 37578 (July 1, 2014) ("2014 SPR Policy").  Defendants narrowly interpreted "range" as referring only to a species' current range, which frequently is small in comparison to the species' historic range, which Defendants argue "should not be separately evaluated."  79 Fed. Reg at 37583-85; 82 Fed. Reg. at 30520, 30624-28.

(c)  Under the 2014 SPR Policy, a portion of a species' range is considered "significant" if the species "is not currently endangered or threatened throughout all of its range, but the portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range."  79 Fed. Reg. at 37579; 82 Fed. Reg. at 30624-28.  Defendants' interpretation of "significant" caused a Federal District Court to hold that the 2014 Final SPR Policy was arbitrary and capricious.  *Center for Biological Diversity v. Jewell*, 248 F. Supp. 3d 946, 955-58 (D. Ariz. 2017), amended, 2017 WL 8788052 (D. Ariz. 2017), appeal dismissed, 2018 WL 3155693 (9th Cir. 2018).

(d)  Even if the ESA does not compel Defendants to interpret "range" to mean the historical geographical area over which the species once was distributed, as opposed to its current range, that interpretation "does not mean that [Defendants] can brush off a substantial loss of historical range as irrelevant to the species' endangered or threatened status."  *Humane*

*Society of the United States v. Zinke*, 865 F. 3d 585, 605 (D. C. Cir. 2017).  See *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001).

15.  The ESA requires Defendants, "on the basis of the best scientific and commercial" information and data available, to determine whether a species is endangered or threatened because of any one or more of the following five factors and to list the species under the ESA if one or more of the factors is satisfied:  (a) Present or threatened destruction, modification or curtailment of its habitat or range; (b) overutilization for commercial, recreational, scientific or educational purposes; (c) disease or predation; (d)  inadequacy of existing regulatory mechanisms; or (e) other natural or manmade factors affecting its continued existence.  16 U.S.C. § 1533(a)(1); 50 C.F.R. § 424.11(b) and (c).

16.  A decision by Defendants to "delist" a species (i.e., remove the species' ESA protection) also must be based upon the "best scientific and commercial data available to the Secretary of [DOI] after conducting a review of the status of the species."  50 C.F.R. § 424.11(b) and (d).  The factors considered in delisting are the same five factors considered for the original listing as set forth in ¶ 15.  50 C.F.R. § 424.11(d).

17.  The ESA "requires [Defendants] to attend to both parts of the listing process - the initial listing and the revision or delisting - with equal care."  *Humane Society of the United States v. Zinke*, 865 F. 3d at 597.

18.  The principal goal of the ESA is recovery so that ESA protection is no longer required based on the best scientific and commercial information.[2]  "The objective of the ESA is

---

[2] This recovery principle was explicitly enshrined in the ESA regulations (at 50 C.F.R. § 424.11(d)(2)) until it was deleted by Defendants in 2019.  84 Fed. Reg. 44753 (Sept. 26, 2019). The deletion apparently was intended by Defendants to allow delisting before recovery contrary to the fundamental purpose of the ESA.

to enable listed species not merely to survive, but to recover from their endangered or threatened status." *Sierra Club v. U. S. Fish & Wildlife Service*, 245 F.3d 434, 438 (5th Cir. 2001).

19. (a) The ESA defines "species" to include "any distinct population segment of any species of vertebrate . . . wildlife which interbreeds when mature." 16 U.S.C. § 1532(16).

(b) The ESA does not define "distinct population segment" or "DPS." However, in 1996 Defendants and the NMFS adopted a policy, *Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act* ("1996 DPS Policy"), to clarify their interpretation of DPS "for the purposes of listing, delisting and reclassifying" vertebrate species under the ESA. 61 Fed. Reg. 4722 (Feb. 7, 1996). Defendants and the NMFS determined that the 1996 DPS Policy was "non-regulatory in nature" and, therefore, was not subject to the APA notice and public comment requirements. *Id.*

(c) Defendants and the NMFS stated in the 1996 DPS Policy that it was important for the term DPS to be interpreted in a "clear and consistent fashion"; that Congress had instructed Defendants to exercise their DPS authority "sparingly" and only when the biological evidence indicates that such action is warranted; that "sound biological principles" must be followed; and that the policy should be "aimed at carrying out the purposes of the [ESA]." *Id.*

(d) Under the 1996 DPS Policy, Defendants must consider two scientific factors in making any decision with regard to the status of a possible DPS as endangered or threatened (*Id.* at 4725. See 72 Fed. Reg. at 14874-78.): (i) Discreteness of the population segment in relation to the remainder of the species to which it belongs and (ii) significance of the population segment to the species to which it belongs. A population segment is a DPS only if it satisfies both factors. See *Center for Biological Diversity v. Zinke*, 868 F. 3d 1054, 1058 (9th Cir. 2017).

(e)  The D. C. Circuit Court of Appeals, in a case challenging Defendants' delisting of Gray Wolves in the Western Great Lakes region, held that "[Defendants], even after a species as a whole has been identified as endangered or threatened, [can] cleave out a subset of that already-listed species for delisting based on the segment's recovery . . . ." *Humane Society of the United States v. Zinke*, 865 F. 3d at 596.  However, the Court held that Defendants "could not call it quits upon finding a [DPS]." *Id.* at 601.  The Court held that Defendants' failure to consider the effects of delisting on the remnant population caused the delisting to be invalid:

> [Defendants'] power is to designate genuinely discrete population segments; it is not to delist an already-protected species by balkanization.  [Defendants'] cannot circumvent the [ESA's] explicit delisting standards by riving an existing listing into a recovered sub-group and a leftover group that becomes an orphan to the law.  Such a statutory dodge is the essence of arbitrary-and-capricious and ill-reasoned agency action.

*Id.* at 603.  See, e. g., *Humane Society of the United States v. Jewell*, 76 F. Supp. 3d 69 (D. D. C. 2011); *Humane Society of the United States v. Kempthorne*, 579 F. Supp. 2d 7 (D. D. C. 2008).  In other words, the DPS designation process was *not* intended by Congress to be used to "divide and conquer" or "balkanize," i.e., to divide species into arbitrary segments in order to manipulate and distort the process of delisting under the ESA.

## VI.  Protection of Gray Wolves Under the ESA

20.  Gray Wolves, historically the nation's most common large carnivores with habitat extending across almost all states, were nearly extirpated by the early 1930s, or even before, with European settlement as a result of (a) hunting and active eradication programs carried out by Defendants and others, including hunters and agricultural interests, and (b) widespread habitat destruction leaving only small portions of Gray Wolves' original range.  43 Fed. Reg. 9607 (March 9, 1978).

21.  Gray Wolves in the lower 48 states and Mexico have been repeatedly listed, reclassified and delisted by Defendants since 1966 under the ESA and its legislative predecessors; and federal courts have been called upon frequently to intervene to decide the fate of Gray Wolves and have generally rejected Defendants' "regulatory missteps" as described by the Court in *Humane Society of the United States v. Zinke*, 865 F. 3d at 591-95.  85 Fed. Reg. at 69779-82.  See *Center for Biological Diversity v. Haaland*, 2021 WL 4806846 (D. Ariz. Oct. 14, 2021) (remand to Defendants with instructions).

## VII. <u>Removal of Gray Wolves' Protection Under the ESA</u>

22.  Refusing to accept the results of litigation and facing substantial political pressure, in 2019 Defendants published a proposed rule to remove Gray Wolves in the contiguous United States and Mexico from the list of protected species under the ESA, a massive assault on Gray Wolves.  84 Fed. Reg. 9648 (March 15, 2019; "2019 Proposed Delisting Rule").

23.  About 757,000 comments were filed by the public, including Plaintiff, under the APA with regard to the 2019 Proposed Delisting Rule; those comments overwhelmingly opposed delisting.[3]  Defendants, contrary to the APA (5 U.S.C. § 553), ignored that public sentiment in the 2020 Final Delisting Rule.[4]  85 Fed. Reg. at 69856-78.

---

[3] More than 97% opposed delisting:  **https://medium.com/westwise/analysis-trump-administration-ignores-overwhelming-public-opposition-in-delisting-the-gray-wolf-18970c021be6**

[4] See *Eli Lilly & Co. v. Cochran*, 526 F. Supp. 3d 393, ___ (S. D. Ind. 2021) ("Given the scope of the regulatory process and the extensive, intrusive, and consequential impact of exercises of regulatory power, the APA's procedural protections are far from pro forma.  Rather, they provide an essential pathway by which the interested public may inform the agency of the ways and extent any potential policy changes will impact those being regulated.  The purpose of the notice and comment requirement is to permit regulated entities to influence rulemaking at the beginning of the process and not simply after rules are already in place, at which point the agency 'is far less likely to be receptive to comments'."  (Citations omitted.)

24. Defendants outsourced the required peer review process for the 2019 Proposed
Delisting Rule, including selection of the peer reviewers, to an outside contractor, Atkins North
America, Inc. (85 Fed. Reg. at 69844), which, in turn, engaged the individual peer reviewers,
who severely criticized the 2019 Proposed Delisting Rule[5]:

- **Peer Reviewer - Dr. Fred W. Allendorf**, p. 1:
  - "I had some difficulties in my evaluation because many statements throughout
    . . . do not include citations for the basis of the conclusion. For example, the
    following sentence occurs without a citation . . . : 'Wolves in the entity
    appear to be genetically and demographically healthy.' I am a geneticist, but I
    do not know what is meant by the phrase 'genetically healthy.' The common
    absence of citations made it hard to evaluate if the best available information
    was used and to evaluate the quality of the scientific information."

- **Peer Reviewer - Dr. Charles Carroll**, pp. 3, 5, 6-7, 9, 10, 11, 18):
  - "The report . . . provides an incomplete and simplistic characterization of wolf
    metapopulation structure, which is characterized by complex genetic clines
    driven by historical biogeographic factors, isolation by distance, and
    association with particular ecosystems."
  - "The report combines detailed description of the distribution of suitable wolf
    habitat in some regions with the almost complete omission of such informa-
    tion in other regions. In this respect, the report is inconsistent with previous
    iterations of wolf listing and delisting rules, which at least attempted a more
    geographically complete treatment of the distribution of suitable habitat."
  - "I found that the proposed rule did not build on the assembled scientific
    information to provide coherent factual support or logical explanation for the
    agency's conclusions."
  - "A key oversight . . . lies in the lack of detail and rigor in the treatment of
    genetic issues" based on "an extreme oversimplification of the genetic
    structure of wolf metapopulations at regional and continental extents."
  - "The proposed rule contains only a brief statement that [range of] wolves will
    be unaffected by climate change, but this ignores issues regarding conserva-
    tion of ecotypic variation and adaptive potential within the species."

---

[5] Atkins North America, Inc., Member of SNC-Lavalin Group, *Summary Report of Independent
Peer Reviews for the U. S. Fish & Wildlife Service Gray Wolf Delisting Review* (Version 1.0;
May 2019; 1000062975). **https://www.google.com/search?client=firefox-b-1-
d&q=Summary+Report+of+Independent+Peer+Reviews+for+the+U.+S.+Fish+and+Wildli
fe+Service+Gray+Wolf+Delisting+Review**

- ○ "The treatment of range . . . is markedly inconsistent with how range is treated for other species that have been delisted or proposed for delisting under the ESA."
- ○ "[S]tatements [with regard to resiliency, redundancy and representation] misinterpret both wolf ecology and the 3Rs themselves."
- ○ "The rule is inconsistent in its treatment of unoccupied suitable habitat. For example, areas currently unoccupied by wolves such as the Olympic Range of Washington or unoccupied areas within the Great Lakes region are described and considered in detail . . ., but other regions holding large areas of suitable wolf habitat which were considered in depth in earlier wolf rulemaking, particularly Colorado/Utah and the northeast US, are only mentioned in passing . . . ."

- **Peer Reviewer - Dr. Adrian Treves**, pp. 1-3:
  - ○ "I find the draft biological report adequate on the taxonomy but not on the biology, ecology or biological status."
  - ○ "[T]he proposed rule does not address human-caused mortality or habitat suitability adequately."
  - ○ "In the 48-page review that follows I detail the many sources of evidence that are missing to draw . . . conclusions and the many contrary findings that seem to have been overlooked, which undermine the conclusions."
  - ○ "In sum, I do not find the proposed rule and draft biological report present the best available science . . . ."

Defendants ignored those criticisms in the 2020 Final Delisting Rule.  85 Fed. Reg. at 69844-56.

25.  (a)  After the 2020 Final Delisting Rule was promulgated, killings of Gray Wolves resumed under state "management" at levels comparable to those that took place before they were protected by the ESA.

(b)  In May 2021 the State of Idaho enacted a law (S. B. 1211), effective July 1, 2021, that allowed up to 90% of Idaho's Gray Wolves, including pups, to be killed anywhere in the state, including private property, at any time, including by private contractors and the USDA's notorious agency, Wildlife Services, by shooting, trapping, snaring and other methods.

(c)  In April 2021 the State of Montana enacted laws (H. B. 224; H.B. 225; S. B. 314) that made it easier to kill more Gray Wolves "to reduce the wolf population to a sustainable level," including expanding the trapping season; allowing baiting, trapping, snaring and using

artificial light and night vision scopes; and applying "the most liberal harvest regulations . . . in regions with the greatest number of wolves . . . ."

(d)  According to a July 5, 2021, Report prepared by a research team at the University of Wisconsin, led by Dr. Adrian Treves, one of Defendants' peer reviewers (see ¶ 24),[6] in the State of Wisconsin, which in February 2021 was the first state to hold a wolf hunt after issuance of the 2020 Final Delisting Rule with the goal of "[allowing] for a sustainable harvest that neither increases nor decreases the state's wolf population," at least 218 Gray Wolves, or about 20% of the state's wolf population, were killed, which was approximately 100 more Gray Wolves than the state intended to kill by issuing 2,380 permits; and an additional 98-105 wolves died after the 2020 Final Delisting Rule was issued "that would have been alive had delisting not occurred, primarily as a result of "cryptic poaching," defined as "illegal killing in which perpetrators conceal evidence."  The Report's authors concluded:

> Although one subnational jurisdiction may not predict another, doubts about sustainable wolf-killing and misuse of scientific information have been raised previously for other governments.  Therefore, we find our case is not unique and provides insights for other jurisdictions.  Similar wolf-killing might be replicated elsewhere when subnational jurisdictions in the USA and EU regain authority for controversial predators.  Federal governments in both regions should recognize that loosening protections for predators . . . opens the door for antagonists to kill large numbers in short periods, legally and illegally.  The history of scapegoating of wolves may repeat itself. . . .  (Citations omitted.)

26.  On August 11, 2021, Wisconsin's Board of Natural Resources approved a second hunting season to begin on November 6, 2021, for killing 300 Gray Wolves, which was more than double the quota of 130 Gray Wolves proposed by the Department of Natural Resource, the

---

[6] Treves A., Santiago-Ávila F. J. and Putrevu K., 2021, *Quantifying the effects of delisting wolves after the first state began lethal management*, PeerJ 2021; 9: e11666 July 5, 2021).
https://doi.org/10.7717/peerj.11666

state's wildlife agency.[7]  On September 21, 2021, six Chippewa Indian Tribes filed a lawsuit

against Wisconsin and requested the court to declare the hunt illegal and provide injunctive relief

to prevent violation of treaty rights.  *Red Cliff Band of Lake Superior Chippewa Indians of*

*Wisconsin et al. v. Cole et al.*, U. S. District Court, Western District of Wisconsin, Case No.

3:21-cv-00597.

     27.  (a)  On June 1, 2021, Defendants received a Petition under 5 USC § 553(e) and 16

USC § 1533(b)(3) from the Center for Biological Diversity and The Humane Society of the

United States, environmental organizations, requesting that Gray Wolves in the Northern Rocky

Mountains be listed as an endangered or threatened DPS under the ESA; and on July 29, 2021,

and August 10, 2021, Defendants received a Petition and Addendum, respectively, from Western

Watersheds Project, an environmental organization, requesting that Gray Wolves in the Western

United States be listed as endangered under the ESA.  86 Fed. Reg. 51857 (Sept. 17, 2021).

     (b)  Defendants determined that the Petitions, sources cited therein and readily available

information presented "credible and substantial information" that "human-caused mortality

(Factor B) may be a potential threat to the species in Idaho and Montana. . . . . [which] include

75 percent of gray wolves in a potential Northern Rocky Mountain or Western DPS" and "new

regulations in these two States may be inadequate to address this potential threat (Factor D)."

Defendants also determined that Petitioners "presented information suggesting that habitat

modification due to a reduced prey base (Factor A), disease (Factor C), and loss of genetic

diversity caused by isolation and small population size (Factor E) may be threats to the gray

---

[7] The harmful effects of the second hunt in 2021 are described in a recent scientific paper by one
of Defendants' peer reviewers for the 2021 Final Delisting Rule, Dr. Adrian Treves (see ¶¶ 24,
25(d)), and another author.  Treves, A. and Louchouarn, N., *Uncertainty and precaution in*
*hunting wolves twice a year* (Oct. 25, 2021).  **https://doi.org/10.1101/2021.10.25.465697**

wolf." Defendants concluded that they would "[initiate] a status review of the species to determine whether the actions are warranted under the [ESA]" and issue a finding when the review is completed pursuant to 16 USC § 1533(b)(3). 86 Fed. Reg. 51857 (Sept. 17, 2021).

## VIII.  The APA

28.   The APA provides standards for judicial review of a final federal agency action such as the 2020 Final Delisting Rule. 5 U.S.C. §§ 702 – 706.  The reviewing court must hold unlawful and set aside the final agency action if it is found to be (a) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law or (b) without observance of procedure required by law.  5 U.S.C § 706(2)(A) & (D).

29.   Defendants are federal agencies subject to the APA; their promulgation of the 2020 Final Delisting Rule constituted a final agency action for which there is no other adequate legal remedy and, therefore, is subject to review by this Court under the APA, 5 U.S.C. § 704.

## IX.  Claims for Relief [8]

### A.  Claim No. 1 - Violation of Mandatory Statutory Deadline

30.   Defendants published the 2019 Proposed Delisting Rule to remove ESA protection for Gray Wolves in the lower 48 states and Mexico in the Federal Register on **March 15, 2019**. 84 Fed. Reg. 9648.

31.   The 2020 Final Delisting Rule was required to be published within one year from that date, i.e., **March 15, 2020**, pursuant to 16 USC § 1533(b)(6)(A), which provided, in pertinent part, that "within the *one-year period* beginning on the date on which general notice is published in accordance with [16 USC § 1533(b)(5)(A)(i)] regarding a proposed regulation,

---

[8] The allegations in ¶¶ 1 - 29 are incorporated by reference in each Claim for Relief set forth below as if fully set forth therein.

[Defendants] **shall** publish in the Federal Register (i) if a determination as to whether a species is an endangered species or a threatened species . . . is involved . . . (I) a final regulation to implement such determination . . . ." (Emphasis added.)

32.  The deadline for listing and delisting purposes in 16 USC § 1533(b)(6)(A) was **reduced** to one year by the Endangered Species Act Amendments of 1982, Pub. Law 97-304. The legislative history is entirely clear that Congress intended the one-year deadline, possibly extended by six months by affirmative action of Defendants in limited circumstances (see ¶ 33), to be strictly enforced:

> [D]eterminations as to the final status of species proposed to be listed or delisted . . . **must** be completed within one year of the date of proposal. . . .

H. Rep. No. 97-567, 97th Cong., 2d Sess. 21 (May 17, 1982) (Emphasis added.).

> To ensure that proposals . . . are acted upon **quickly**, the Committee adopted a provision, new section 4(b)(6)(A) [16 USC § 1533(b)(6)(A)], to **shorten** the allowable time for final action on . . . proposals to list or delist a species from 2 years to one year from date of proposal.  The one-year period after proposal . . . may, under limited circumstances, be extended to eighteen months. . . .

> Within such one-year period (or 18-month period, if an extension occurs), [Defendants] **must** make a final determination with respect to proposals to list or delist a species . . . .   [They] **must** determine, **on the basis of the information then available**, either that the species should be listed or delisted, or that the proposal for listing or delisting should not be promulgated as a final regulation . . . . . . .

> Section 4, as amended, requires that [Defendants] make various findings within specified periods of time.  Such **mandatory** findings are usually to be followed by 'prompt' publication of such findings, a proposed regulation, or a final regulation. Unless **explicitly** qualified, the time periods set forth in section 4, as amended, must be **strictly adhered to** by [Defendants]. . .

H. Conf. Rep. No. 97-835, 97th Cong., 2d Sess. 23 (Sept. 17, 1982) (Emphasis added.).

33.  (a)  As stated in the legislative history, Defendants could have extended the one-year deadline in 16 USC § 1533(b)(6)(A) up to six months under 16 USC § 1533(b)(6)(B)(i) if there

was "substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination or revision concerned."

(b) The legislative history states that "sufficiency or accuracy of the available data" in 16 USC § 1533(b)(6)(B)(i) refers only to "those instances where the biological status of the species is being questioned by scientists knowledgeable about the species and not to allow additional time for the economic or other analyses related to the designation of critical habitat." H. Rep. No. 97-567, 97th Cong., 2d Sess. 22 (May 17, 1982).

34. The one-year deadline in 16 USC § 1533(b)(6)(A) and the six-month extension in 16 USC § 1533(b)(6)(B)(i) have an extremely important purpose for endangered and threatened species under the ESA. They prevent Defendants from making critical survival decisions for endangered and threatened species ESA based on scientific and biological information and analyses that have become stale due to the passage of time.

35. Defendants violated the one-year deadline in 16 USC § 1533(b)(6)(A) by publishing the 2020 Final Delisting Rule in the Federal Register on **November 3, 2020**, which was **over seven months after** expiration of the March 15, 2020, deadline.

36. Defendants did **not** extend the deadline beyond March 15, 2020, as permitted by 16 USC § 1533(b)(6)(B)(i).

37. The one-year deadline was **mandatory** in accordance with the explicit language of 16 USC § 1533(b)(6)(A) and the legislative history described in ¶ 32. See, e.g., *Kingdomware Technologies, Inc v. United States*, 136 S. Ct. 1969, 1977 (2016).

38. Defendants were **fully aware**, at the highest official levels, of the mandatory one-year deadline **before** the deadline expired. A memorandum entitled "Decision Briefing Documents for Action by Secretary or the Deputy Secretary -- Options for Gray Wolf

Rulemaking" attached to a **February 24, 2020**, internal email to Gary Frazer, Defendants' high-level official in charge of the Gray Wolves delisting program (see ¶ 7), with copies to six other officials, stated:

> *PLEASE INDICATE IF TIME SENSITIVE*:  The statutory deadline for the Service to publish a final determination on the proposal to delist the gray wolf is March 15, 2020.

Despite the acknowledged time sensitivity, Defendants decided to disregard the statutory deadline.  On April 10, 2020, the most senior official of Defendant FWS, Director Aurelia Skipwith, and Defendant DOI's Assistant Secretary for Fish and Wildlife and Parks, Rob Wallace, sent a memorandum, signed by both, entitled "Template for Decision Briefing Documents for Action by Secretary or the Deputy Secretary," to the most senior official of Defendant DOI, Secretary of the Interior David Bernhardt, stating:

> *PLEASE INDICATE IF TIME SENSITIVE:*
>
> The statutory deadline for publishing the final rule (one year after publication of the proposed rule, or March 15, 2020) has passed, so the final determination is overdue.  We have not, however, yet received any Notices of Intent to Sue to enforce that statutory deadline.

39.  Defendants also were **fully aware** that they could extend the mandatory statutory deadline by six months but decided not to extend despite repeated self-imposed postponements of their internal Federal Register publication dates.  Defendants prepared an internal "Gray Wolf 5-Year Review and Final Rule Statement" that included, under the heading "For use if asked about the March 15, 2020, statutory deadline," the following "On-the-record statement":

> We are currently working on a final delisting determination, but we require additional time to thoroughly address public and peer review comments and appropriately assess the population status.

Nevertheless, as stated by Vanessa Kauffman, an employee of Defendants, in a March 19, 2020, email to Gary Frazer, a high-level official of Defendants (see ¶¶ 7, 38), and three other officials,

responding to a media inquiry with regard to timing of the 2020 Final Delisting Rule, "we are not

extending the deadline."  One of the officials who received the Kauffman email, Gavin Shire,

responded on March 19, 2020, in pertinent part, "that was when we knew we were going to miss

the deadline."  Moreover, FWS Director Skipwith stated in an internal April 16, 2020, email to

seven Defendant FWS officials that "I hope this is not a continuance of you and me repeating the

FWS missing deadlines again."

    40.  Defendants' knowledge, and calculated disregard, of the one-year mandatory

statutory deadline and rejection of the six-month statutory extension was not an isolated episode,

since Defendants engaged in the same calculated behavior when they removed ESA protection

for grizzly bears in the Greater Yellowstone Ecosystem.  By email dated November 10, 2016,

Loren Grosskopf, Commissioner, Park County, Wyoming, asked Jodi Bush, Supervisor in

Defendants' Montana State Ecological Services Office, Helena, Montana:

> Could you please remind me what the deadline is for the delisting order . . .?
> Since it was published in 3/11/16, is there a drop-dead date where [Defendants]
> would have to "start over"?

By email later the same day, Bush replied to Grosskopf with the following candid admission of

Defendants' repeated failure to comply with the mandatory deadline:

> The expectation is that we will typically complete a final rule within 12 months of
> the proposed rule for a delisting.  However, we have gone over that timeline
> before so it's not really a drop dead date as such and there isn't anything in the
> [ESA] itself which requires us to meet that timeline.

    (b)  By email dated December 16, 2016, Brian Nesvik, a high-level official of the

Wyoming Game & Fish Department, submitted the following inquiry to Defendants' Bush:

> I am still waiting for a response regarding your intentions with regards to the
> deadline for a final rule . . . . If [Defendants have not] filed a final rule by the 12-
> month mark, what happens?  I don't want my people putting a bunch of effort into
> providing responses for [Defendants] if the rule will be abandoned after the one-

year mark.  Is there a provision in the ESA for an extension?  Will [Defendants] seek an extension if possible and if necessary?

Later the same day Defendants' Bush replied to Nesvik with the same candor as before:

So you're correct - our statute says 1 year.  However, we often miss it.  And the only legal case we are aware of was for the bald eagle which took 10 years, and we settled.

We think this is a very low risk.  Worst case, whoever would sue us wouldn't be able to do so for at least 2 months after our final rule is due (with 60 NOI), and then we probably settle which takes a few months to develop.

Also we would point out in the settlement agreement that the volume of comments here is probably pretty good grounds to take a bit longer to be thorough and give them adequate consideration.

So, in reality if we can get the final rule complete within a few months of the March due date, our legal risk is very low.

(c)  In March 2017, Gary Frazer, Defendants' official in charge of the Gray Wolves delisting project and Bush's supervisor (see ¶¶ 7, 38, 39), acknowledged in an internal briefing paper Defendants' legal vulnerability due to violation of the one-year mandatory deadline:

b.  What is driving the timing?  We are past the statutory one-year mark from publishing the proposed rule (March 11, 2016) and are ***legally vulnerable***.  Chances of receiving [a Notice of Intent to file a lawsuit] will increase with a belated publication date. . . .

c.  What happens if the deadline is missed?  The risk of receiving a notice of intent to sue increases; . . . .  (Emphasis added.)

41.  Defendants' violation of the mandatory one-year statutory deadline for promulgation of the 2020 Final Delisting Rule was not a harmless procedural error.  See ¶ 34.

42.  Defendants' failure to meet the March 15, 2020, mandatory deadline for the 2020 Final Delisting Rule was arbitrary, capricious and not in accordance with law and without observance of procedure required by law, and, therefore, the 2020 Final Delisting Rule must be declared invalid, set aside and enjoined pursuant to the ESA and APA.  5 U.S.C § 706(2).

## B.  Claim No. 2 - Political Contamination

43.  Defendants are required by the ESA to make a delisting decision "solely on the basis

of the best available scientific and commercial data available.  16 U.S.C. § 1533(b)(1)(A); 50

C.F.R. § 424.11(b), (d).  See ¶ 16.  Congress explicitly recognized that political issues cannot be

considered with regard to listing and delisting decisions under the ESA:

> [Defendant FWS] has allegedly omitted [two species] from the list [of protected
> species under the ESA] for fear of provoking the Congress into major revisions of
> the [ESA].
>
> The committee considers these allegations to be extremely serious.  Those
> individuals charged with the administration of the [ESA] do ***not have the legal
> authority to weigh the political importance of an endangered species***.

H. R. Rep. No. 95-1625, 95th Cong., 2d Sess. 737 (1978) (Emphasis added.).

44.  The courts have repeatedly held that political interference contaminates an agency

decision such as the 2020 Final Delisting Rule.  E. g.,  *Earth Island Institute v. Hogarth*, 484

F.3d 1123, 1134-35 (9th Cir. 2007); *Latecoere International, Inc. v. U. S. Dept. of the Navy*, 19

F.3d 1342 (11th Cir. 1994); *Portland Audobon Society v. Oregon Lands Coalition*, 984 F.2d

1534, 1543-48 (9th Cir. 1993); *Town of Orangetown v. Ruckelshaus*, 740 F. 2d 185, 188 (2d Cir.

1984); *Koniag, Inc. v. Andrus*, 580 F.2d 601, 610 (D.C. Cir. 1978), cert denied, 439 U.S. 1052

(1978); *Pillsbury Co. v. Federal Trade Commission*, 354 F.2d 952 (5th Cir. 1966); *Saget v.

Trump*, 375 F. Supp. 3d 280, 359-60 (E. D. N. Y. 2019); *Tummino v. Torti*, 603 F. Supp. 2d 519,

544-47 (E. D. N. Y. 2009); *Save Our Springs v. Babbitt*, 27 F. Supp. 2d 739 (W. D. Texas 1997);

*Sokaogon Chippewa Community v. Babbitt*, 961 F. Supp. 1276 (W. D. Wis. 1997).

45.  The broad-based political contamination of Defendants' decision-making process as

an institutional matter was confirmed by a Report, *Progress and Problems: Government*

*Scientists Report on Scientific Integrity at Four Agencies (2015)*,[9] issued by the Union of

Concerned Scientists, a respected national organization of scientists, which surveyed 981

scientists and received 382 written responses. The Report established that Defendants, at the

national and regional levels, have been plagued by lack of scientific integrity due to the heavy

influence of politics; under-funding by Congress; leadership that lacks scientific knowledge,

bows to political pressure and is concerned with protecting their jobs; under-staffing; and

declining morale.

46.  Defendants, having (a) violated the mandatory statutory deadline (see ¶¶ 30-42); (b)

ignored overwhelming public sentiment against delisting (see ¶ 23); (c) violated the delisting

requirements of the ESA (see ¶ 15); and (d) ignored severe criticisms by its own peer reviewers

(see ¶ 24), necessarily were influenced primarily by heavy political pressure to promulgate the

2020 Final Delisting Rule.

47.  Political interference with regard to the 2020 Final Delisting Rule began at an early

date and continued unabated thereafter, assuring that Defendants' decision with regard to

delisting Gray Wolves would not be based on the best available scientific and commercial

information.  See ¶¶ 16, 43.

48.  (a)  On December 6, 2010, Matthew Huggler, Chief, Office of Congressional and

Legislative Affairs of Defendant FWS, informed high-level officials of Defendants by email that

he and then-Director of Defendant FWS Dan Ashe would meet that afternoon with Senator Amy

Klobuchar of Minnesota, a state covered by the 2020 Final Delisting Rule, and Tristan Brown of

Senator Klobuchar's staff with regard to "Follow-up Wolf Meeting."

---

[9] **https://www.ucsusa.org/resources/progress-and-problems**

(b)  Later on December 6, 2010, Lara Levison of the Office of the Secretary of Defendant

DOI informed Mr. Huggler and the recipients of his mail earlier that day as follows:

> I won't be able to join you, but I wanted to pass along the following.  Tristan
> Brown with Sen. Klobuchar called me (and also Megan Kelhart) to request that
> FWS put out a public statement by the middle of this week saying that the FWS
> will move to delist the gray wolf.  The Senator is sending the Secretary a letter
> today that will be an updated version of last year's letter, that will urge that the
> wolf be delisted in 2011.  He said, whatever is said about the [Northern Rocky
> Mountains] gray wolf, say the same about Minnesota too.  He also asked for
> comments on their draft legislation, which he provided to Megan. . . .

(c)  On December 7, 2010, Senator Klobuchar, following up with regard to a December

2009 letter she had sent jointly with Representative Jim Oberstar of Minnesota, sent a

threatening letter to then-Secretary of Defendant DOI Ken Salazar and then-Director of

Defendant FWS Dan Ashe, stating:

> I write again to urge you to expedite the delisting of the gray wolf in the Great
> Lakes and inform you that I will be ***introducing legislation*** to help speed-up this
> process.  (Emphasis added.)

(d)  The December 6, 2010, meeting and related emails gave rise to a flurry of activity

involving officials at the highest levels of Defendants and culminated in a December 9, 2010,

letter from Thomas Strickland, Assistant Secretary of Defendant DOI for Fish and Wildlife and

Parks, that succumbed to Senator Klobuchar's political pressure, stating:

> Currently, we are working to publish, by April 2011, a proposed rule to delist the
> wolf.  We aim to publish a final determination by the end of 2011.  I assure you
> that returning management of recovered species to the States remains a top
> priority for the Department.

Assistant Secretary Strickland added a handwritten note at the bottom of the December 9, 2010,

letter: "Senator - Please contact me if you have further questions.  Best, Tom"

(e)  According to Defendants' internal emails, Assistant Secretary Strickland's December 9, 2010, letter had been given an "expedited review"; approved by Secretary Salazar personally; and provided to Senator Klobuchar for approval before it was finalized.

(f)  According to a December 9, 2010, internal email involving seven officials of Defendants, "DOI is delivering the letter to Sen. Klobuchar today, and she'll announce (today or Friday) that FWS will be delisting [Gray Wolves] in 2011."

49.  (a)  In 2011 Senator Jon Tester of Montana inserted a rider, Section 1713, into H. R. 1473, Public Law 112-10, 125 Stat. 38 (2011), the "Department of Defense and Full Year Continuing Appropriations Act of 2011," that (i) required Defendants to reissue their April 2009 rule delisting Gray Wolves in Idaho, Montana, eastern Oregon, north-central Utah and eastern Washington; (ii) precluded comments by the public under the APA with regard to the reissued rule; and (iii) precluded judicial review of the reissued rule.  H. R. 1473 was enacted into law.[10] Section 1713 was implemented in 2011.  85 Fed. Reg. at 69780-81.

(b)  Defendant Williams attributed Section 1713 to a response by Congress "to mounting pressure from Montana and Idaho" and characterized Section 1713 as a "reward" to those states. Williams, *Lessons From the Wolf Wars: Recovery v. Delisting Under the Endangered Species Act*, 27 Fordham Env'l Law Rev. 106, 139, 142 (2015).

50.  Defendant Williams acknowledged the existence and importance of political pressure in the "wolf wars," referring, for example, to "the political rhetoric of Wyoming's unwillingness or inability to demonstrate its commitment to the long-term recovery of wolves" and quoting with approval a statement by a law school professor that "the same political pressures that stand in the way of adding species, push toward delisting."  Williams, supra ¶ 49(b) at 149.

---

[10] See *Alliance for the Wild Rockies v. Salazar*, 672 F. 3d 1170 (9th Cir. 2012).

51.  In June 2017 Senator John Barrasso of Wyoming introduced S. 1514, the "Hunting Heritage and Environmental Legacy Preservation for Wildlife Act," in the U. S. Senate.  Sections 7 and 8 would have (a) required Defendants to reissue the final rules delisting Gray Wolves in the (i) western Great Lakes area[11] and (ii) State of Wyoming[12] and (b) precluded judicial review of the reissued rules.  S. 1514 was not enacted into law.  Congress explicitly confirmed its political interference in the legislative history with regard to the western Great Lakes area ("[I]t is unlikely [Defendants] would be able to successfully remove gray wolves in the Western Great Lakes from the [protected] list [under the ESA] absent intervention from Congress.") and Wyoming ("[W]hile state management of the gray wolf has been reestablished in the state, the possibility of overturning the [final delisting] rule . . . remains a possibility unless new law is enacted prohibiting further judicial review.").  S. Rep. 115-168, 115th Cong., 1st Sess. 3-4 (2017).

52.  On May 13, 2019, 69 members of the U. S. House of Representatives signed a letter to the Secretary of Defendant DOI in opposition to delisting Gray Wolves, stating:

> The [delisting] proposal does not appear to represent the best available science and contains serious legal flaws that undermine not only the recovery of gray wolves, but hundreds of other endangered species nationwide.  This delisting proposal appears to be ***motivated primarily by political pressure rather than the best available science***, and we urge you to withdraw the proposed rule. (Emphasis added.)

53.  On May 28, 2019, 34 members of the U. S. House of Representatives (31 Republicans primarily from western states and 3 Democrats), confirming the role of political pressure with regard to delisting Gray Wolves as stated in the letter described in ¶ 52, signed a letter to the Secretary of Defendant DOI and the Principal Deputy Director of Defendant FWS

---

[11] See *Humane Society of the United States v. Zinke*, 865 F. 3d 585 (D. C. Cir. 2017).

[12] See *Humane Society of the United States v. Zinke*, 849 F. 3d 1077 (D. C. Cir. 2017).

expressing their "strong support" for the 2019 Proposed Delisting Rule and urging them "to move forward with the implementation of this proposed rule in an expeditious manner."

54.  On September 11, 2019, the U. S. Senate Environment & Public Works Committee held a hearing to consider the nomination of Aurelia Skipwith as the Director of Defendant FWS. Soon after the hearing Skipwith was confirmed. See ¶¶ 38, 39.  Thereafter she signed the 2020 Final Delisting Rule.  The following exchange took place at the hearing specifically with regard to Gray Wolves and grizzly bears (Tr. 33-34):

> Senator Barrasso:  Ms. Skipwith, Wyoming is no stranger to the challenges that states face when courts intervene in conservation decisions.  Despite [Defendants'] best efforts . . . , it took years to delist the gray wolf in Wyoming and to return it to state management following a full recovery of the species. . . . [T]he courts have now forced the grizzly bear to be relisted in spite of the efforts of [Defendants].  In your opinion, does it hurt state and local recovery efforts if courts prevent or delay the delisting of species that [Defendants] clearly say are recovered?

> Ms. Skipwith:  Senator, thank you very much for that question.  The science shows that the grizzly bear and gray wolves are biologically recovered.  To reach that status, it employs working with the states, working with private landowners and other organizations to reach that goal.  That is truly a success of the Endangered Species Act.  Knowing that those species are still on the list, that ends up directing resources to work on that instead of focusing on imperiled species that really need recovery efforts.

> Senator Barrasso:  So when the courts intervene, to overdo . . . what the agency has done, that is detrimental to recovery of other species as well as to the states where those species are?

> Ms. Skipwith:  Yes, Mr. Chairman, it does.

This contrived exchange, presumably pre-arranged for the Senate public hearing record, confirms that improper political interference was a major factor with regard to finalization and issuance of the 2020 Final Delisting Rule.

55.  The following table summarizes the relentless assaults by politicians over the last decade against the ESA generally and Gray Wolves particularly, assaults that Defendants, the

indirect targets of the assaults, have been unwilling and/or unable to resist, resulting in the 2020

Final Delisting Rule:

| Year | Sponsor(s) | Bill No. | Purpose | Passed? |
|------|-----------|----------|---------|---------|
| 2011 | Rep. Rehberg | HR 510 | Prohibits protecting Gray Wolves under ESA nationwide | No |
| 2011 | Rep. Rehberg | HR 510 | Prohibits protecting Gray Wolves under ESA in MT & ID | No |
| 2011 | Sen. Hatch | S 249 | Prohibits protecting Gray Wolves under ESA nationwide | No |
| 2011 | Sen. Baucus | S 321 | Delists gray wolves in ID, MT & parts of OR, UT & WA from protection under ESA | No |
| 2011 | Rep. Pearce | HR 1 (Amendment 342) (Rider) | Cuts all funding for Mexican gray wolf recovery program | No |
| 2011 | Rep. Lummis | HR 2584 (Amendment 194) (Rider) | Prohibits protecting Gray Wolves in ID, MT, MI, MN, WI & parts of OR, UT & WA under ESA | No |
| 2011 | Rep. Kline | HR 838 | Prohibits protecting Gray Wolves in MI, MN & WI under ESA | No |
| 2011 | Sen. Tester | HR 1473 (Sec. 1713) (Rider) | Delists Gray Wolves in ID, MT & parts of OR, UT & WA from protection under ESA | Yes |
| 2011 | Rep. Miller | HR 1819 | Prohibits protecting Gray Wolves in Western Great Lake states, Northern Rockies states, AZ, NM, CO & NV under ESA | No |
| 2011 | Rep. Simpson | HR 2584 (Sec. 119) | Prohibits protecting Gray Wolves in Western Great Lake states & Wyoming under ESA | No |
| 2011 | Rep. Tester | HR 2584 | Eliminates all funding to list any species as endangered or threatened or to designate critical habitat under ESA fiscal year 2012 | No |
| 2011 | Rep. Benishek | HR 3453 | Allows states to conduct lethal control of gray wolves to protect against depredations in any state where wolf population exceeds recovery goal | No |
| 2016 | Rep. Leutkemeyer | HR 5281 | Automatically eliminates ESA protections for all species unless Congress votes to extend protections for each species & require state | No |

| | | | governor approval for species to be listed | |
|------|------------------|------------------|---------------------------------------------------------------------------------------------------------------|-----|
| 2016 | Rep. Sessions | H amend-ments to S 2012 (Sec. 2202) | Reissues 2012 final rule to delist Gray Wolves in Wyoming under ESA | No |
| 2016 | Rep. Sessions | H amend-ments to S 2012 (Sec. 2202) | Reissues 2011 & 2012 final rules to delist Gray Wolves in MI, MN, WI & WY under ESA; precludes judicial review | No |
| 2016 | Rep. Calvert | HR 5538 (Sec. 119) (Rider) | Reissues 2011 & 2012 final rules to delist Gray Wolves in MI, MN, WI & WY under ESA; precludes judicial review | No |
| 2016 | Sen. Murkowski | S 3068 (Sec. 119) (Rider) | Reissues 2011 & 2012 final rules to delist Gray Wolves in MI, MN, WI & WY under ESA; precludes judicial review | No |
| 2016 | Rep. Pearce Rep. Gosar | HR 5538 (Sec. 494) (Rider) | Permanently delists Mexican gray wolves under ESA; blocks portions of recovery plan | No |
| 2016 | Rep. Newhouse | HR 5538 (Sec. 477) (Rider) | Permanently delists all Gray Wolves in all Lower 48 states | No |
| 2017 | Rep. Cheney Rep. Peterson | HR 424 | Reissues 2011 & 2012 final rules to delist Gray Wolves in MI, MN, WI & WY under ESA; precludes judicial review | No |
| 2017 | Sen. Barrasso Sen. Klobuchar Sen. Baldwin | S 164 | Reissues 2011 & 2012 final rules to delist Gray Wolves in MI, MN, WI & WY under ESA; precludes judicial review | No |
| 2017 | Sen. Flake Sen. McCain | S 368 | Allows hostile states to intervene in forming Mexican Gray Wolves recovery plan despite ESA requirement to use only best available science | No |
| 2017 | Sen. Flake Sen. Paul | S 935 | Automatically eliminates ESA protections for all species unless Congress votes to extend protections for each species; eliminates ESA protections for species found only in one state; eliminates citizens' right to submit petition to protect species under ESA | No |

| 2017 | Rep. Duncan | HR 3668 | Reissues 2011 & 2012 final rules to delist Gray Wolves in MI, MN, WI & WY under ESA; precludes judicial review | No |
|------|-------------|---------|--------------------------------------------------------------------------------------------------------------|----|
| 2017 | Sen. Barrasso<br>Sen. Klobuchar<br>Sen. Baldwin<br>S. Cardin | S 1514 | Reissues 2011 & 2012 final rules to delist Gray Wolves in MI, MN, WI & WY under ESA; precludes judicial review | No |
| 2017 | Rep. Calvert | HR 3354 (Sec. 116) (Rider) | Reissues 2011 & 2012 final rules to delist Gray Wolves in MI, MN, WI & WY under ESA; precludes judicial review | No |
| 2017 | Rep. Calvert | HR 3354 (Sec. 117) (Rider) | Blocks funding for ESA protections for all Gray Wolves in Lower 48 states & recovery | No |
| 2017 | Rep. Smith<br>Rep. Gianforte | HR 3354 (Sec. 461) (Rider) | Restricts federal agencies from paying legal fees for citizen suits under ESA, other federal statutes | No |
| 2017 | Sen. Murkowski | Sec. 120 (Chairman's mark) | Reissues 2011 & 2012 final rules to delist Gray Wolves in MI, MN, WI & WY under ESA; precludes judicial review | No |
| 2018 | Rep. Duffy<br>Rep. Newhouse | HR 6784 | Reissues 2011 & 2012 final rules to delist Gray Wolves in western Great Lakes states, &WY under ESA; requires delisting Gray Wolves in other Lower 48 states under ESA; precludes judicial review | No |
| 2019 | Rep. Peterson<br>Rep. Stauber<br>Rep. Sensenbrenner<br>Rep. Gallaagher<br>Rep. Kind<br>Rep. Moolenaar<br>Rep. Huizenga | HR 4494 | Reissues 2011 final rule to delist Gray Wolves in western Great Lakes states without regard to any other federal statute or regulation; requires consultation by states with tribal governments | No |
| 2019 | Sen. Lee<br>Sen. Romney<br>Sen. Daines<br>Sen. Johnson | HR 3140 | Requires issuance of final rule removing ESA protection for Gray Wolves in lower 48 states & Mexico without regard for other federal statutes; precludes judicial review | No |
| 2020 | Rep. Peterson<br>Rep. Bishop | HR 6035 | Requires issuance of final rule removing ESA protection for Gray Wolves in lower 48 states & Mexico without regard for other federal statutes; precludes judicial review | No |

| 2020 | Rep. Tiffany Rep. Stauber | HR 8180 | Amends ESA to remove future listing of Gray Wolves in MI, MN, WI & WY; removes current listing of Gray Wolves in those states; precludes listing under EA of Gray Wolves in any other lower 48 state if population at or above goal set by state's wildlife agency | No |
|---|---|---|---|---|

56. In February 2015 a group of 52 U. S. scientists wrote an Open Letter to members of

Congress opposing any legislation that would remove ESA protection for Gray Wolves. After

stating the reasons, the Open Letter concluded:

> [W]e urge Congress to oppose any legislation to remove the gray wolf (*Canis lupus*) from protections under the ESA. Wolves are an enormous asset to the biological diversity of our country and are well tolerated by the American public. After decades of making excellent progress toward recovery, it would be a shame to stop before the final goal is accomplished.

57. Defendants were **fully aware**, at the highest official levels, of the political

interference with regard to delisting Gray Wolves as indicated by the following internal emails:

| Date | From | To | Message |
|---|---|---|---|
| 4/3/20 | Aurelia Skipwith, Director of Defendant FWS | Six Defendant FWS officials | "The Department has tasked the hallways/bureaus with a new project which is to help us amplify our accomplishments . . . over the last 3+ years. So, starting in about a month, they would like for the Department to have daily media/events/social media highlighting these accomplishments. These may range from a Bureau-level tweet *to proposed events involving the White House*." (Emphasis added.) |
| 8/4/20 | Gary Frazer, Assistant Director - Ecological Services | Karen Budd-Falen, Deputy Solicitor, Fish, Wildlife & Parks, Defendant DOI; Aurelia Skipwith, Director of Defendant FWS; two DOI lawyers | "We are scheduling a briefing for everyone on the *political team* involved in the clearance process to facilitate timely review [of the 2020 Final Delisting Rule for 'legal sufficiency']." (Emphasis added.) |
| 9/3/20 | William Dove, Defendant FWS official | Amr Salih, Defendant FWS official | Transmitting document entitled "Call with Tom Tiffany (R-WI-7)" setting forth talking points with regard to delisting Gray Wolves and providing background information with |

| | | | |
|---|---|---|---|
| | | | regard to Rep. Tiffany, including term in office, committees, caucuses (Congressional Sportsmens' Caucus), previous jobs, Defendant FWS's assets in his district (2 national wildlife refuges; 1 national fish hatchery) and "Relevant Legislation: Amendment to House Interior Appropriations bill offered, but rejected in Rules Committee consideration, that would have prohibited funds from enforcing the ESA listing of the gray wolf." |
| 10/14/20 | Matthew Huggler, Defendant DOI official | 4 Defendant DOI officials | Transmitted documents containing frequently asked questions and answers, including the following: (bold-face in original):<br>**"11.  What stakeholder groups or third-party validators might be leveraged for a statement, quote or other supportive action?**<br>. . . .<br>• Members of Congress - CLA recommends pursuing quotes from a selection of the following members: Sen. Barrasso (R-WY; co-sponsors legislation; Chair EPW); Sen. Johnson (R-WI; sponsors legislation); Sen. Baldwin (D-WI; co-sponsors legislation); Rep. Newhouse (R-WA); Rep. LaMalfa (R-CA-1); Rep. Stauber (R-MN-8); sponsors legislation); Rep. Peterson (R-MN-7; sponsors legislation); Rep. Bishop (R-UT-1); Rep. Bergman (R-MI-1); Rep. Walden (R-OR-2)." |
| 10/20/20 | Michael Gale, Defendant FWS official | Aurelia Skipwith, Director of Defendant FWS | Transmitted document entitled "FULL COMMUNICATIONS STRATEGY for High-Profile or Controversial Announcements," which included, under heading "20.  Congressional emails" (bold-face and italics in original):<br>**"Members**<br>*See attached spreadsheet of Congressional staff contacts.  Target offices include: Members of relevant authorizing and appropriations committees, range state delegations, sponsors and co-sponsors of relevant legislation, and Members who have engaged on the issue.  Spreadsheet indicates Members recommended for DOI/FWS leadership calls.*<br>**"Committees** |

| | | | |
|---|---|---|---|
| | | | *CLA will contact authorizing committee staff; DOB will contact appropriations staff.* [Table of Congressional committees and names and contact details for persons to be contacted omitted here]" |
| 10/29/20 | Matthew Huggler, Defendant DOI official | Aurelia Skipwith, Director of Defendant FWS, and one other DOI official | "DOI asked us to provide a quote from you for a wolf news release that Congressman Stauber is going to put out today." [Proposed text provided] Director Skipwith responded with a alternative text. |
| 10/29/20 | Defendant DOI | Defendant FWS officials | Provided 12-page Press Release entitled "Trump Administration Returns Management and Protection of Gray Wolves to States and Tribes Following Successful Recovery Efforts."  Press Release contained favorable quotes from Representatives Pete Stauber (N-08), Ken Calvert (CA-42), Dan Newhouse (WA-04), Collin Peterson (MN-07), Tom Emmer (MN-06). Chris Stewart (UT-02), Mike Simpson (ID-02), Bruce Westerman (AR-04), Ken Buck (CO-04) and Paul Gosar (AZ-04) and Governors Noem (SD) and Ricketts (NE). |

58.  On December 21, 2020, Plaintiff filed a comprehensive request with Defendants under the Freedom of Information Act ("FOIA Request"), 5 USC § 552, in which he requested all communications involving political pressure to delist Gray Wolves, but Defendants, as of the date of filing this Complaint, due to inadequate searches and unreasonable delays, have not fully responded to that request.  Therefore, Plaintiff expects to bring to light, through discovery, with this Court's permission, additional evidence of improper political interference relating to the 2020 Final Delisting Rule, if Defendants do not (a) fully respond to the FOIA Request **and** (b) include such critical evidence in the Administrative Record ("AR") that they will file in this case.[13]

---

[13] Defendants' detailed Guidelines for compiling an AR are set forth in the following documents (together "AR Guidelines"):  (1)  "Compiling a Decision File and an Administrative Record," 282 FW 5 (March 2, 2007) ("FWS Guidance") and (2) Exhibit 1 to the FWS Guidance, which

59.  The 2020 Final Delisting Rule was contaminated beyond repair by improper political interference, rather than supported by the best available scientific and biological information, reflected in the relevant delisting factors, and, therefore, was arbitrary, capricious and not in accordance with law and must be set aside pursuant to the ESA and APA. 5 USC § 706(2).

## X.  **REQUESTS FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

---

includes (i) June 27, 2006, Memorandum from David Bernhardt, Deputy Solicitor of Defendants, to Assistant Secretaries and Directors of Bureaus and Offices and (ii) "Department of the Interior Standardized Guidance on Compiling a Decision File and an Administrative Record" (together "DOI Guidance").  **https://www.fws.gov/policy/282fw5.html**

The AR Guidelines are **mandatory**:  "All employees who are responsible for . . . decisions and establishing an administrative record *must* follow the guidance . . . . " FWS Guidance, § 5.2. (Emphasis added.)  Defendants "*must* take great care in compiling a complete AR" due to the importance of the AR in judicial review of a decision by Defendants.  DOI Guidance, Part A, § II.  (Emphasis added.)  The "potential outcome of an improperly prepared [AR]" is that "the court [might] grant a plaintiff's motion to supplement the record and/or overturn [Defendants'] position."  FWS Guidance, § 5.13.

The AR process begins early with compilation of an "organized, accurate and thorough Decision File."  The Decision File "should be compiled as documents are generated or received during the decision-making process, making it a *contemporaneous* record of the decision."  DOI Guidance, Part A, § II (emphasis added).  The early beginning of the process in the form of a Decision File is designed to "increase agency efficiency and performance should it become necessary to create an AR," since "most, if not all of the documents that go into an AR should be in a properly maintained Decision File."  DOI Guidance, Part A, § II; Part B, § I; Part C, § II.

The AR must be organized in a "logical and accessible way so that someone unfamiliar with the issue can find specific documents quickly."  DOI Guidance, Part C, § XII.  Thus, the AR must have an Index organized by subject matter for ease of navigation; and each document must have a unique number for uniform reference by the parties to the litigation.  DOI Guidance, Part C, §§ XIII & XIV & Appendix 1.

The mandatory AR Guidelines emphasize a continuous and comprehensive process involving (a) a complete, organized and accurate Decision File from the beginning to the end of the decision-making phase and (b) efficient and timely conversion of the Decision File to a functional and accessible AR, indexed by subject matter, if litigation materializes, as in this case.

1.  Declare that the 2020 Final Delisting Rule removing Gray Wolves from the list of threatened species under the ESA violated the ESA and the APA;

2.  Vacate and set aside the 2020 Final Delisting Rule removing Gray Wolves from the list of threatened species under the ESA;

3.  Enjoin Defendants from implementing and enforcing the 2020 Final Delisting Rule;

4.  Reinstate Defendants' prior rule providing protection under the ESA for Gray Wolves; and

5.  Grant such additional relief as the Court deems just and proper.


Robert H. Aland, Pro Se Plaintiff

140 Old Green Bay Road
Winnetka, IL  60093-1512
Telephone:  (847) 784-0994
Fax:  (847) 446-0993
rhaland@comcast.net

October 27, 2021